# IN THE COURT OF APPEALS OF IOWA

No. 16-1131
Filed September 14, 2016

IN THE INTEREST OF R.C.,
Minor Child,

D.C., Father,
        Appellant.
_____

Appeal from the Iowa District Court for Pocahontas County, Adria A. Kester, District Associate Judge.


An incarcerated father appeals the termination of his parental rights and asks for permanency to be deferred for six months. **REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.**


Daniel L. Feistner, Humbolt, for appellant father.

Thomas J. Miller, Attorney General, and Kathrine S. Miller-Todd, Assistant Attorney General, for appellee State.

Joseph L. Tofilon of Thatcher & Tofilon, P.L.C., Fort Dodge, guardian ad litem for minor child.


Considered by Potterfield, P.J., and Doyle and Tabor, JJ.

**TABOR, Judge.**

Duane, an incarcerated father, appeals the order terminating his parental rights to his three-year-old daughter, R.C. In granting the State's petition to terminate, the juvenile court relied on Iowa Code section 232.116(1)(e) and (h) (2015).[1] On appeal, Duane claims the State did not offer clear and convincing evidence supporting those grounds. He also alleges the Iowa Department of Human Services (DHS) did not make reasonable efforts to reunite him with R.C. Duane further argues the juvenile court should have deferred permanency for six months to allow him the opportunity to reestablish himself in the community and reengage with his daughter.

After reviewing the record de novo, we conclude continuation of the child's placement for an additional six months is appropriate, given R.C.'s bond with Duane, the strong parenting potential shown by Duane when he is sober, his commitment to substance-abuse programs offered by the department of corrections, and the short-term nature of his incarceration. *See* Iowa Code § 232.104(2)(b). Accordingly, we reverse the termination order and remand for further proceedings.

Our decision to continue placement is also influenced by Duane's reasonable-efforts argument. A parent's incarceration does not absolve the DHS of its duty to provide reunification services, including visitation if reasonable. *See In re S.J.*, 620 N.W.2d 522, 525 (Iowa Ct. App. 2000); *see also In re K.M.*, No. 16-0795, 2016 WL 4379375, at *5 (Iowa Ct. App. Aug. 17, 2016); *In re K.L.P.*,

---

[1] The juvenile court order also terminated the parental rights of R.C.'s mother. She is not a party to this appeal.

No. 15-1371, 2015 WL 6507840, at *4–5 (Iowa Ct. App. Oct. 28, 2015). Here, the DHS failed to follow the mandate from *In re S.J.* to make a record concerning the reasonableness of facilitating visitation or other contact between R.C. and her father while he was confined at the Fort Dodge Correctional Facility. In the absence of any record regarding why visits were not offered, we are reluctant to accept the State's supposition that an additional six months of services would not lead to a successful reunification of father and daughter.

## I.      Facts and Prior Proceedings

R.C. was born in December 2012. Her parents, Duane and Jessica, were not married but had a shared custody arrangement. R.C. was removed from her home and adjudicated as a child in need of assistance (CINA) just after her first birthday based on her parents' substance-abuse issues. R.C. was returned to her parents' custody in November 2014. Duane was on probation at the time for public intoxication, third or subsequent offense.

During the spring of 2015, Jessica relapsed into substance abuse and spent time in jail for an operating-while-intoxicated charge. Duane, who was living with his mother, assumed primary care of R.C. From service providers' observations of Duane interacting with R.C., the DHS believed Duane had good parenting skills. But a night of heavy drinking ended Duane's custody of R.C. Around 1:00 a.m. on June 2, 2015, a passing motorist discovered R.C. unattended in her stroller in the traveled portion of a street in the town of Laurens. A few hours later, the police arrested Duane for child endangerment and public intoxication. Duane's probation was revoked based on his consumption of alcohol; pursuant to a plea agreement, the State dismissed the

child-endangerment charge and Duane pleaded guilty to third-offense public intoxication. In August 2015, he received a pair of indeterminate two-year sentences to be served consecutively.

The DHS worker testified she met with Duane in July 2015 while he was in the Pocahontas County jail but had no contact with him after he went to prison. At the termination hearing, the DHS worker had the following exchange with Duane's attorney concerning visitation:

> Q. [B]ased on your knowledge, training and history in these types of cases, when you have a parent who's incarcerated, what types of things do you do to work with a parent to try and avail them access to their child? A. Generally, a child that young, we do not provide visits while they're incarcerated.
> Q. So you would not bring—you would not or did not bring [R.C.] to the jail? A. I did not bring [R.C.] to visit Duane in jail or prison and neither did the FSRP [Family Safety Risk Permanency] worker. The contact that Duane received was the monthly report from the FSRP worker while he was incarcerated.
> Q. Do you know if Duane asked to have [R.C.] brought to the jail in person or to have telephonic contact with [R.C.]? A. He did not ask me.
> Q. Okay. For either one? A. He did not ask me to have contact with [R.C.] nor did he ask me to have visits with her while he's been incarcerated, to my knowledge.
> Q. And again, he can testify to that. But in general, if a parent is incarcerated in jail or potentially in prison and does make that request, how would you respond to that, through telephone or in-person contact? A. It would depend on the age of the child and how much meaningful contact they'd had prior to—what I want to say is how much they've been involved in the child's life prior to their incarceration.

When asked to describe Duane's relationship with R.C. before his incarceration, the worker recalled Duane was the child's primary caretaker in April and May 2015, and both the DHS worker and FSRP worker were "quite impressed" with his parenting abilities. The DHS worker also noted Duane had the support of R.C.'s maternal grandmother. The worker acknowledged "there

was definitely a bond" between R.C. and Duane, and she believed, "when he is sober, Duane is a respectable and decent father."

The FSRP worker echoed the viewpoint that Duane exhibited positive parenting skills before his arrest in June 2015. In her words: "He played a lot with [R.C.]. He gave her a lot of attention."

Despite recognizing the bond between Duane and R.C., neither the DHS nor the FSRP service agency made any efforts to facilitate visitation while he was incarcerated. When cross-examined by Duane's counsel, the FSRP worker did not appear to have entertained the possibility of arranging visits at the correctional facility: "Q. How does that usually work as far as somebody being incarcerated? A. Honestly, this is the first person that I've had incarcerated in prison." The FSRP worker testified she did not know whether telephone contact could have been provided.

Duane testified he did not request contact with R.C. during his incarceration because he did not know visits were available to him. He testified that at the time he was in jail, he did not know if it was appropriate for R.C. to see him, but had he known he was allowed some type of contact with her, he would have taken that opportunity.

Duane further testified at the June 3, 2016 termination hearing that he expected to be paroled in early August 2016, after he had completed his substance-abuse-treatment programming. He acknowledged his alcohol abuse was "out of control" before he was arrested on June 2, 2015. Duane said he was attending NA and AA in prison and believed they were "very good groups." He also testified he had been approved for disability benefits because he suffered

from and had been taking medication for chronic back pain and extreme anxiety with panic attacks.

The juvenile court issued its order terminating parental rights on June 21, 2016.[2]  The court reasoned:

> Duane, by all reports, was a competent parent when out of custody and sober.  Unfortunately, he was unable to maintain his sobriety despite at least two attempts at treatment.  He believes he has six convictions for public intoxication.  His most recent treatment was completed on March 30, 2015.  He was arrested shortly thereafter (June 2, 2015) for public intoxication and child endangerment.  He was unable to stay out of county jail and prison since the birth of his child, resulting in long periods of time where he was unavailable to care for his child.  He participates in services available to him from the Department of Corrections.  Although Duane asserts he could care for his child upon his release from prison, it is unlikely.

The court declined to grant Duane an additional six months to work toward reunification—noting his lack of progress in caring for R.C. due to his lack of visitation with her.  Duane now appeals.

## II.    Scope of Review

We review child-welfare appeals de novo, which means we examine both the facts and law and adjudicate anew those issues properly preserved and presented.  *See In re L.G.*, 532 N.W.2d 478, 480 (Iowa Ct. App. 1995).  The State bears the burden to prove the allegations in its petition by clear and convincing evidence.  *See* Iowa Code § 232.96(2).  The clear-and-convincing standard requires more than a preponderance of evidence but less than proof

---

[2] The child's guardian ad litem (GAL) recommended termination in a written report to the court.  The GAL met only with the foster parents.  He did not interview any medical, mental health, education, or service providers.  *See* Iowa Code § 232.2(22)(b) (setting out GAL duties).  He did not meet R.C.'s mother or father and did not indicate he was not authorized to do so by the parents' attorneys.  *See id.*

beyond a reasonable doubt. *See L.G.*, 532 N.W.2d at 481. It means there must be no serious or substantial doubt about the correctness of a particular conclusion drawn from the evidence. *Id.*

**III.     Analysis**

A court considering a petition to terminate parental rights must follow a three-step analysis. *In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010). Initially, the court must decide if the State has established a ground for termination under section 232.116(1). *Id.* If the State has done so, the court must then apply the framework set out in section 232.116(2) to decide if proceeding with termination is in the best interests of the child. *Id.* Finally, if the statutory best-interests framework supports termination, the court must consider if any discretionary factors in section 232.116(3) should serve to preclude termination. *Id.*

As grounds for termination, the juvenile court relied on paragraphs (e) and (h). To terminate under paragraph (e), the court must find "clear and convincing evidence that the parents have not maintained significant and meaningful contact with the child during the previous six consecutive months and have made no reasonable efforts to resume care of the child *despite being given the opportunity to do so.*" Iowa Code § 232.116(1)(e)(3) (emphasis added).

To terminate under paragraph (h), the court must find, among other things, "clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time." *Id.* § 232.116(1)(h)(4). As part of its ultimate proof under this provision, the State must establish it made reasonable efforts to return the child to the child's home. *See In re C.B.*, 611 N.W.2d 489, 493 (Iowa 2000). "[T]he reasonable efforts

requirement is not viewed as a strict substantive requirement of termination. Instead, the scope of the efforts by the DHS to reunify parent and child after removal impacts the burden of proving those elements of termination which require reunification efforts." *Id.*; *see also* Iowa Code § 232.102(7) (providing DHS must make "every reasonable effort to return the child to the child's home as quickly as possible consistent with the best interests of the child").

Duane argues the State did not make reasonable efforts to reunify him with R.C. He contends that prior to R.C.'s removal in June 2015, he was maintaining regular contact with his daughter. He emphasizes the record shows he was a good parent when sober and he had a bond with R.C. Once he was incarcerated, Duane was not informed by either the DHS or the FSRP workers that visitation or other contact was a possibility. He insists he would have sought to have continued contact with R.C. if he had known such contact was an option.

In determining whether the DHS has made reasonable efforts, we consider "[t]he type, duration, and intensity of services or support offered or provided to the child and the child's family." Iowa Code § 232.102(10)(a)(1). Among the services commonly provided, we have recognized visitation between a parent and child as perhaps the most important "ingredient to the goal of reunification." *See In re M.B.*, 553 N.W.2d 343, 345 (Iowa Ct. App. 1996). Therefore, the concept of reasonable efforts includes "a visitation arrangement designed to facilitate reunification while protecting the child from the harm responsible for the removal." *Id.*; *see also C.B.*, 611 N.W.2d at 493.

Our case law acknowledges a parent's incarceration may create difficulties in providing reunification services, but we have not excused the DHS

from evaluating the reasonableness of visitation when a parent is serving time in jail or prison. *See In re S.J.*, 620 N.W.2d at 525. In that case, decided sixteen years ago, we held the DHS *must determine* what would be reasonable based on the circumstances of the individual case. *See id.* We articulated a list of factors for the DHS to consider in deciding whether visitation with an incarcerated parent is reasonable, including:

> the age of the children, the bonding the children have or do not have with their parent, including any existing clinical or other recommendations concerning visitation, the nature of parenting deficiencies, the physical location of the child and the parent, the limitations of the place of confinement, the services available in the prison setting, the nature of the offense, and the length of the parent's sentence.

*Id.* We specifically held the DHS "has an obligation to make a record concerning its consideration of this issue." *Id.*

In this case, the DHS did not meet its obligation to document its consideration of providing R.C. visitation with Duane while he was incarcerated. The DHS worker offered only generalized testimony that "a child that young" would not be provided visits with an incarcerated parent. "The child's age alone does not justify denying visitation." *See In re K.M.*, 2016 WL 4379375, at *6. The worker here also said such visitation would depend on the child's relationship with the parent before the incarceration. In this case, Duane was the child's primary caregiver at the time of his arrest and had developed a strong bond with her. He was incarcerated in Fort Dodge, which is about forty-five miles away from Pocahontas County where R.C.'s foster parents lived. The record contains no information about the services available in the prison setting or any clinical or other professional recommendations concerning the appropriateness

of R.C. having contact with her father under these conditions. Without such information, we cannot find the DHS made reasonable efforts to facilitate reunification.

In its brief, the State asserts: "Even if the father had been able to speak with [R.C.] by telephone or to visit with her in prison, such contact would not have been significant and meaningful to [R.C.]." The State makes this assertion without citation to the record, and we find nothing offered in the juvenile court to support the State's position. In fact, experts in child welfare have debunked such a bald assumption, citing studies that show "letters, telephone calls, and visits between children and their incarcerated parents lead to children's improved self-esteem and lower levels of anxiety." *See* Jean C. Lawrence, *ASFA in the Age of Mass Incarceration: Go to Prison-Lose Your Child?*, 40 Wm. Mitchell L. Rev. 990, 1004 (2014). We refuse to assume contact with her incarcerated father would not have been meaningful to R.C.

The State also contends providing the father contact with R.C. would not have changed the result because she could not have been returned to his care at the time of the termination hearing as he remained in prison. *See* Iowa Code § 232.116(1)(h). We agree the State proved the elements of paragraph (h). But reasonable efforts is a requirement in every CINA case, regardless of the ground ultimately alleged by the State for termination of parental rights. *See id.* § 232.102(7). We find a failure to satisfy the reasonable-efforts requirement in this case.

We now turn to the father's request for an additional six months to attempt reunification. We recognize time is "a critical element" when a child is in foster

care. *See C.B.*, 611 N.W.2d at 495. The legislature has set the amount of time that a court must afford a parent before entertaining the termination of parental rights, and we view termination proceedings with a sense of urgency once that period has passed. *See id.*; *see also* Iowa Code § 232.116(1). But severing the parent-child relationship is only appropriate "where more harm is likely to befall the child by staying with his or her parents than by being permanently separated from them." *In re H.H.*, 528 N.W.2d 675, 677 (Iowa Ct. App. 1995). We cannot yet say R.C. faces greater harm in delaying permanency than being permanently separated from her father.

Under the circumstances of this case, we conclude the father should have been afforded an additional six months to attempt reunification. The social workers agreed the father was a good and attentive parent when sober, with R.C. strongly bonding with him before his incarceration. The father's incarceration was not long-term, and he availed himself of appropriate substance-abuse programs while under the supervision of the department of corrections. We reverse the order terminating the father's parental rights and remand for further proceedings.

**REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.**